IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEANETTE MARIE MALLOY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  22-2133 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    January  5, 2024

Jeanette Marie Malloy ("Plaintiff") seeks review of the Commissioner's decision

denying her application for disability insurance benefits ("DIB").  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not

supported by substantial evidence and remand for further proceedings pursuant to

sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on July 17, 2017, alleging that her disability

began on September 29, 2016, as a result of depression, anxiety, asthma, reflex

sympathetic dystrophy ("RSD"), post-traumatic stress disorder ("PTSD"), neuropathy,

endometriosis, adenomyosis, complex reflex pain syndrome ("CRPS"), and migraines.

Tr. at 73, 74, 174, 195.[1]  Plaintiff's application was denied initially, id. at 93-97, and she

requested a hearing before an ALJ, see id. at 98, which took place on July 10, 2019.  Id.

---

[1] I will include relevant definitions in the discussion of the medical evidence.

To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The Certified Earning
Record indicates and the ALJ found that Plaintiff was insured through March 31, 2021.
Tr. at 1033, 1210.

at 34-72.  On August 28, 2019, the ALJ found that Plaintiff was not disabled.  Id. at 15-29 (repeated at 1085-99).  On July 16, 2020, the Appeals Council denied Plaintiff's request for review, id. at 1-3 (repeated at 1112-14).  Plaintiff appealed the administrative decision to the federal court on September 18, 2020.  Malloy v. Saul, Civ. No. 20-4581, Doc. 1.  The late Honorable Marilyn Heffley remanded the case to the Commissioner for further consideration at the Commissioner's request.  Id. Docs. 11, 12; tr. at 1118.

On remand, the Appeals Council remanded the case to the ALJ to further consider (1) the medical source opinions and prior administrative medical findings, (2) Plaintiff's maximum residual functional capacity ("RFC") specifically with respect to Plaintiff's left hand functioning and mental impairments, and obtain supplemental vocational testimony if necessary.  Tr. at 1107-09.  On January 13, 2022, the ALJ held a second administrative hearing, id. at 1056-81, and on March 2, 2022, again found that Plaintiff was not disabled.  Id. at 1030-48.  Plaintiff did not file exceptions in the Appeals Council, nor did the Appeals Council initiate its own review, making the ALJ's March 2, 2022 decision the final decision of the Commissioner.  20 C.F.R. § 404.984(d).

Plaintiff commenced this action in federal court on June 1, 2022, Doc. 1, and the matter is now fully briefed and ripe for review.  Docs. 6-8.[2]

---

[2]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

## II.   <u>LEGAL STANDARDS</u>

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 610 (3d Cir. 2014); <u>see also</u> 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

In her most recent decision, the ALJ found that Plaintiff suffered from the severe impairments of CRPS and RSD of the right foot and left wrist, anxiety, depression, and panic disorder with agoraphobia.  Tr. at 1033.  The ALJ found Plaintiff's spine disorders, gastroesophageal reflux disease ("GERD"), endometriosis, visual impairment, migraines, and asthma were not severe, but considered the effects of all her impairments, regardless of severity, in determining Plaintiff's RFC.  Id. at 1033-34.  The ALJ found that Plaintiff

did not have an impairment or combination of impairments that met the Listings, id. at 1034, and that she had the RFC to perform sedentary work with only occasional use of the right lower extremity for operation of foot controls; no driving; any lifting/carrying to be done primarily with the right upper extremity, using the left as a help for support only; can frequently handle, finger, feel with the left upper extremity, unlimited with the right upper extremity; can have no exposure to extreme cold and to hazards such as unprotected heights and unprotected moving mechanical parts; can have occasional exposure to pulmonary irritants such as smoke, fumes, gases, and poor ventilation; further limited to performing work that needs little or no judgment to do simple duties that may be learned on the job in a short period of time; provides no contact with the general public, only occasional interaction with coworkers and supervisors, and few, if any, changes in the daily job duties, hours and location; the job should be goal, rather than production oriented such that any production requirements can be accomplished by the end of the workday.  Id. at 1035-36.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a massage therapist, agent, or property manager, but could perform the jobs of order clerk, telephone clerk, or document preparer.  Id. at 1046-47.  Therefore, the ALJ found that Plaintiff was not disabled.  Id. at 1047.

Plaintiff claims that the ALJ erred by significantly understating her mental limitations and finding that she could use her dominant left upper extremity for frequent manipulative maneuvers.  Doc. 6.  Defendant responds that substantial evidence supports

the ALJ's evaluation of the opinion evidence and the ALJ's RFC determination.  Doc. 7.

Plaintiff filed a reply in support of her original brief.  Doc. 8.

### B.        Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on April 26, 1980, and thus was 36 years old when her alleged

disability began (September 29, 2016) and 40 years old when her insured status expired

(March 31, 2021).  Tr. at 38, 174.  Plaintiff has an Associate's Degree in health sciences

and has worked as a massage therapist, realtor, and property manager.  Id. at 40-42, 197.

At the time of the first hearing (July 10, 2019), Plaintiff lived with her husband and three

children, ages 14, 15, and 6.  Id. at 38.  At that administrative hearing, Plaintiff explained

that her CRPS causes pain in her right foot and left hand that measures 9.5 on a 10-point

scale.  Id. at 44-45.  Plaintiff described the pain "like . . .  walking on hot thumbtacks."

Id. at 45.  With respect to her left (dominant) hand, Plaintiff explained that she cannot

wash her own hair, do laundry, dishes, dress, text or play games on a phone because she

has lost the mobility in the hand and, although she can hold a pen, she cannot write with

it because the pain is "excruciating."  Id. at 46-47.

With respect to her agoraphobia, Plaintiff testified at the first hearing that she

spends five out of seven days a week in her room without leaving and requires

encouragement from her family to leave her room.  Tr. at 58.  She also suffers from daily

panic attacks brought on by the thought of leaving the house and suffers from mood

swings and crying spells.  Id. at 58-59.  She has insomnia and goes for several nights a

month without sleeping.  Id. at 59.

At the more recent administrative hearing, Plaintiff testified that she was having more difficulty using her left hand and depended more on her right hand.  Tr. at 1064. Plaintiff also reported that the pain in her foot had gotten worse and she was walking with a limp that was causing back pain.  Id. at 1065.  At that point, Plaintiff stated that she was showering and getting dressed every three or four days.  Id.

At that hearing, a VE classified Plaintiff's work as a massage therapist as medium work, and her work as a realtor and property manager as light.  Tr. at 1069-70.  Relevant to the ALJ's decision, she asked the VE to consider someone of Plaintiff's age, education, and work experience, who was limited to sedentary work, with no contact with the general public and occasional interaction with co-workers and supervisors; occasional use of the right lower extremity for operation of foot controls; no exposure to unprotected heights or moving mechanical parts; no driving; any lifting and carrying may be done primarily with the right upper extremity using the left upper extremity as a helper for support; the ability to frequently handle, finger, and feel with the upper left extremity and unlimited with the right upper extremity; with occasional exposure to pulmonary irritants; requiring little or no judgment to do simple duties that can be learned on the job in a short period of time; involving few if any changes in the daily job duties, hours, and location; that is goal- rather than production-oriented so that any production requirements can be accomplished by the end of the workday; who would need to sit for 1 to 5 minutes after standing and walking for 30 to 45 minutes, but could remain on task.  Id. at 1071- 74.  The VE testified that such a person could not perform Plaintiff's prior jobs, but could perform the positions of order clerk, telephone clerk, and document preparer.  Id. at 1075.

The VE testified that a work limitation to only occasional (rather than frequent) handling, fingering, and feeling would be work preclusive.  Id. at 1076.[3]

### C.     Summary of the Medical Record

Focusing first on her physical conditions, Plaintiff's medical history includes lower back pain for which Frank Perrone, D.O., her primary care provider, prescribed oxycodone,[4] and multiple hammertoe surgeries on her right second toe.  Tr. at 327, 654.[5] After reinjuring her toe in April 2016, she underwent surgery again on September 29, 2016.  Id. at 327, 823-26.  At her first post-operative visit on October 18, 2016, Spencer Monaco, D.P.M., noted that the toe was in excellent alignment and Plaintiff could be full-weightbearing in two weeks.  Id. at 692.  On November 8, 2016, Dr. Monaco noted Plaintiff's complaints of increasing pain in her right foot radiating to the ankle and prescribed a low dose of Neurontin.[6]  Id. at 690.  On November 21, 2016, Dr. Perrone noted Plaintiff's complaints of increased depression since the surgery indicating that

---

[3]Also, as to contact with the public, the ALJ clarified that the person could have no direct contact with the public, but could answer phones or give out information over the phone.  Tr. at 1074-75.  The VE testified that if the hypothetical person could not have telephone contact with the public, there would be no jobs available.  Id. at 1076.

[4]Oxycodone is an opioid medication used to treat moderate to severe pain.  See https://www.drugs.com/oxycodone.html (last visited Dec. 19, 2023).

[5]Many of the treatment notes appear multiple times in the record.  See, e.g., tr. at 356, 645, 730, 984 (Nov. 21, 2016 treatment note from Dr. Perrone).  Throughout this opinion, I will refer to the first instance of the treatment notes in the record.

[6]Neurontin (generic gabapentin) is an anticonvulsant used to treat neuropathic pain.  See https://www.drugs.com/neurontin.html (last visited Dec. 12, 2023).

Plaintiff had not be able to get out of bed.  Id. at 356.  The doctor increased Plaintiff's dosage of oxycodone.  Id. at 360.

On December 8, 2016, Plaintiff began treatment at the Center for Interventional Pain & Spine ("IP&S") for complaints of right neck, scapula, hip, and knee pain, and carpel tunnel pain of the left hand.  Tr. at 501.  On examination, Venkatesh Sundararajan, M.D., noted Plaintiff had an antalgic gait, her muscle strength was slightly reduced in right plantar flexion, and she had a positive straight leg raising test on the right.  Id. at 504.  The doctor diagnosed lumbar radiculopathy, lower back pain, chronic pain syndrome, and CRPS,[7] continued oxycodone, and planned a right lumbar sympathetic block.  Id.

Plaintiff underwent several injections at IP&S from December 16, 2016, through December 3, 2021, with varying levels of pain relief.  See tr. at 471, (Dec. 16, 2016 – right lumbar sympathetic block - 50% relief in recovery), 470, 520 (same on Dec. 30, 2016, 50% relief for five days), 455, 441 (May 4, 2017 – C7-T1 interlaminar epidural steroid injection – provided significant relief), 454, 520 (June 30, 2017 – L4-L5 interlaminar epidural steroid injection – no relief), 401 (Sept. 20, 2017 – right lumbar sympathetic nerve block), 445 (Oct. 13, 2017 – C7-T1 interlaminar epidural steroid injection), 439 (Dec. 5, 2017 – right lumbar sympathetic block), 538 (same on Dec. 20,

---

[7]CRPS is "a chronic pain syndrome of uncertain pathogenesis, usually affecting an extremity and characterized by intense burning pain, changes in skin color and texture, increased skin temperature and sensitivity, sweating, and edema.  Type 1 (called [RSD]) often follows tissue injury, but without demonstrable nerve injury, and may be accompanied by posttraumatic osteoporosis . . . ."   Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1826.

2017), 540- 542 (same on Jan. 22, 2018 - 50% relief noted the following month), 547,

548 (Mar. 23, 2018 – left stellate ganglion block – 50%-70% relief reported following

month), 553, 554 (same on May 21, 2018 – 50% - 70% relief two months later), 565

(same on Sept. 17, 2018), 578, 579 (Jan. 7, 2019 – C7-T1 interlaminar epidural injection

– 60% relief reported following month), 1603, 1592 (June 14, 2019 – right lumbar

sympathetic block – 50% relief two weeks later), 1543, 1532 (Jan. 24, 2020 – right intra

articular hip injection – 80% relief following month), 1530 (Feb. 28, 2020 – right lumbar

sympathetic nerve block), 1444, 1434 (Oct. 9, 2020 – left stellate ganglion block – 75%

relief following month), 1430, 1418  (same on Jan. 8, 2021 – 70% relief following

month), 1416, 1407 (March 5, 2021 – lumbar sympathetic block – 50% relief following

month), 1405, 1400 (Apr. 30, 2021 – left stellate ganglion block – 70% relief following

month), 1396, 1388 (May 21, 2021 – right lumbar sympathetic block – 70% relief two

months later), 1374 (same on Aug. 6, 2021), 1372, 1356 (same on Sept. 3, 2021 – more

than 50% relief following month), 1342 (Dec. 3, 2021 – left stellate ganglion block).  In

addition, she was treated with oxycodone, gabapentin, belbuca, and medical marijuana,[8]

see e.g., id. at 554 (July 12, 2018 - refill gabapentin and oxycodone), 566 (Nov. 2, 2018 –

refill oxycodone and belbuca), 1488, 1493 (refill oxycodone, counseled on medical

marijuana), 1459, 1463 (Aug. 24, 2020 – refill oxycodone and patient reports relief on

medical marijuana regimen), 1388-89 (July 13, 2021 – oxycodone, belbuca, gabapentin,

---

[8]Belbuca contains buprenorphine, an opioid medication, used for around-the-clock treatment of moderate to severe chronic pain.  See https://www.drugs.com/belbuca.html (last visited Dec. 20, 2023).

recertify for medical marijuana).  During treatment, she was described as "stable on chronic narcotic medication," id. at 1507, and ">50% relief with current pain management and medication regimen."  Id. at 1493.  During her treatment at IP&S, the doctors noted allodynia[9] and decreased range of motion in the left hand.  See, e.g., id. at 582 (Feb. 15, 2019), 1595 (June 27, 2019 – decreased range of motion and allodynia in left hand, but improved).

In July 2017, Plaintiff also consulted Vincera Core Physicians, seeking ketamine infusions.[10]  Tr. at 408-11.  On examination, physicians' assistant ("PA") Olivia Ehmann noted tenderness at the facet joint on the right from L4-S1, mild swelling of the left hand, and "[v]ery limited dorsiflexion, plantar flexion" of the right ankle.  Id. at 410.  PA Ehmann prescribed ketamine cream, mexiletine, clonidine, gabapentin, and Zofran.[11]  Id. at 411.  On August 4, 2017, Plaintiff reported that she did not obtain the ketamine cream

---

[9]Allodynia is pain resulting from a non-noxious stimulus to normal skin.  DIMD at 51.

[10]Ketamine is used to put you to sleep for surgery and to prevent pain and discomfort during certain medical tests and procedures.  See https://www.drugs.com/mtm/ketamine.html (last visited Dec. 19, 2023).  Ketamine infusion therapy is used for treatment-resistant depression.  See https://www.health.harvard.edu/blog/ketamine-for-treatment-resistant-depression-when-and-where-is-it-safe-202208092797 (last visited Dec. 19, 2023).

[11]Mexiletine is used to treat seriously irregular heartbeats.  See https://www.drugs.com/mtm/mexiletine.html (last visited Dec. 19, 2023).  Clonidine is used to treat hypertension.  See https://www.drugs.com/clonidine.html (last visited Dec. 19, 2023).  Zofran is used to prevent nausea and vomiting.  See https://www.drugs.com/zofran.html (last visited Dec. 19, 2023).

due to cost and was offered another topical cream.  Id. at 406.  On September 7, 2017, Plaintiff noticed improvement in her pain with the new medications.  Id. at 403.[12]

On January 24, 2018, David Dzurinko, M.D., conducted a consultative examination.  Tr. at 484-89.  On examination, Dr. Dzurinko noted that Plaintiff's joints were stable, but her right ankle and left hand were very tender, with three trigger points noted.  Id. at 488.  The doctor found Plaintiff had 5/5 strength in her upper extremities and bilateral grip strength of 5/5 with hand and finger dexterity intact.  Id. at 488.  The doctor diagnosed Plaintiff with CRPS, history of anxiety and depression, history of motor vehicle accident with chronic neck and shoulder pain, status post fracture of the right ankle with open reduction internal fixation and three surgical repairs,[13] pelvic pain from endometriosis and adenomyosis, decrease in vision of the right eye, alopecia, and gastroparesis.  Id. at 488.

Dr. Dzurinko opined that Plaintiff could frequently lift and carry 10 pounds, occasionally carry up to 50 pounds, sit for 8 hours a day, stand for 3 hours in 1-hour increments, and walk for 2 hours at intervals of 30 to 60 minutes.  Tr. at 490-91.  He also opined that Plaintiff could frequently use her right hand for reaching, handling, fingering, feeling, and pushing/pulling, frequently use her left (dominant) hand for reaching and pushing/pulling, and occasionally use her left hand for handling, fingering, and feeling.

---

[12]Plaintiff reported she needed disability in order to start the ketamine infusions. Tr. at 403.

[13]It is unclear if the doctor is referring to Plaintiff's second toe on the right foot, which has been surgically repaired three times.  Although there is mention of injury to Plaintiff's right ankle, see tr. at 403, there is no indication of surgery performed on her right ankle.

Id. at 492.  She could frequently use her left foot to operate foot controls and occasionally use the right foot to operate foot controls.  Id.  The doctor noted limitations in the range of motion of Plaintiff's right knee and right ankle and found no limitation in Plaintiff's grip strength.  Id. at 496-99.

On February 1, 2018, at the initial consideration stage, Kevin Hollick, D.O., found, based on his review of the record, that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand/walk about 6 hours and sit about 6 hours in an 8-hour workday.  Tr. at 84-85.  Notably, the doctor found the Plaintiff did not have any postural or manipulative limitations.  Id. at 85.

In June 2019, Dr. Sundararajan from IP&S referred Plaintiff for physical therapy, from which she was discharged after her initial evaluation because she did not return.  Tr. at 618.  In September 2021, Dr. Sundararajan referred Plaintiff to Daniel Skubick, M.D., of the Neurologic Group, for treatment of her low back pain.  Id. at 1283.  Dr. Skubick recommended a diagnostic musculoskeletal ultrasound of the supraspinous ligament.  Id. at 1285.  Sonography of the back revealed a mildly thickened supraspinous ligament at the L3-S1 levels and "an old avulsion injury" superior to L3.  Id. at 1248.  Levon N. Nazarian, M.D., performed an ultrasound-guided corticosteroid injection at the L3-S1 levels.  Id. at 1248; see also id. at 1286.  Although Plaintiff had no immediate relief, she noted 25-50% improvement after two weeks.  Id. at 1286.

With respect to her mental health, Plaintiff was hospitalized at Friends Hospital in December 2005 when she was suicidal.  Tr. at 477.  More recently she treated with her primary care physician, Dr. Perrone, for anxiety and depression.  See, e.g., id. at 759-60,

762 (Apr. 5, 2016 – active problems include anxiety and depression, medications include alprazolam and citalopram).[14]  Two months following Plaintiff's September 2016 surgery, Dr. Perrone noted increased depression and increased Plaintiff's oxycodone to address her foot pain, although the psychiatric examination was normal.  Id. at 356, 360.  On April 11, 2017, Dr. Perrone noted Plaintiff's complaints of an increase in depressive mood and that Plaintiff was not completing activities of daily living.  Id. at 350.  He renewed Plaintiff's Xanax for anxiety and bupropion for anxiety and depression.[15]  Id. at 354.  Dr. Perrone's notes from July 25, 2017, indicate that Plaintiff's anxiety level was out of control and that she was in weekly counseling.  Id. at 345.[16]  The doctor discontinued Plaintiff's Celexa and prescribed Trintellix.[17]  Id. at 348.  When Plaintiff saw Dr. Perrone on January 17, 2018, he noted that she "appears in a major depression."  Id. at 969.  Plaintiff "had stopped Trintellix and Wellbutrin on her own," so the doctor

---

[14]Xanax (generic alprazolam) is a benzodiazepine used to treat anxiety disorders and anxiety caused by depression.  See https://www.drugs.com/xanax.html (last visited Dec. 19, 2023).  Celexa (generic citalopram) is an antidepressant used to treat major depressive disorder ("MDD").  See https://www.drugs.com/celexa.html (last visited Dec. 19, 2023).

[15]Bupropion (brand name Wellbutrin) is an antidepressant.  See https://www.drugs.com/bupropion.html (last visited Dec. 19, 2023).

[16]There are no counseling notes in the administrative record.  However, Plaintiff told Joseph Primavera, Ph.D., the mental health consultative examiner, that she had been receiving psychological support at South Hampton Behavioral Health since 2005, and her therapist was Mandy Dorfman.  Tr. at 477.  There are no records from South Hampton Behavioral Health or Ms. Dorfman.

[17] Trintellix is an antidepressant used to treat MDD.  See https://www.drugs.com/trintellix.html (last visited Dec. 19, 2023).

continued Xanax, prescribed Cymbalta, and insisted that she seek psychiatric care including inpatient therapy.[18]  Id.

On January 24, 2018, Joseph Primavera, Ph.D., conducted a consultative examination, finding that Plaintiff's thought processes were coherent and goal oriented, affect was depressed, and her mood was dysphoric and in pain.  Tr. at 476, 478.  The doctor found that Plaintiff was "somewhat distractable," could perform simple calculations, but was unable to perform serial 7s counting backwards from 100, and had mild impairment to recent and working memory.  Id. at 478-79.  The doctor diagnosed Plaintiff with MDD, recurrent, moderate, generalized anxiety disorder, panic disorder with agoraphobia, and somatic symptom disorder.  Id. at 479.  In a Medical Source Statement, he found no limitations in Plaintiff's abilities to understand, remember, and carry out simple instructions, and make judgments on simple work-related decisions; and mild limitation in the ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions.  Id. at 481.[19]  With respect to interaction, the doctor found moderate limitation in Plaintiff's abilities to interact with supervisors and co-workers, and marked limitation in the abilities to interact with the

---

[18]Cymbalta is an antidepressant used to treat MDD.  See https://www.drugs.com/cymbalta.html (last visited Dec. 19, 2023).

[19]The form asked the doctor to use a 5-point scale, grading Plaintiff's ability to function in the area independently, appropriately, effectively and on a sustained basis. Tr. at 481.  "None" meant Plaintiff was able to function; "Mild" meant functioning in the area was slightly limited; "Moderate" meant functioning was fair; "Marked" meant functioning was seriously limited; and "Extreme" meant Plaintiff was unable to function in the area.  Id.

public and respond appropriately to usual work situations and changes in a routine work setting.  Id. at 482.

On January 30, 2018, at the initial consideration stage, Richard Williams, Ph.D., found from his review of the record that Plaintiff suffered from depressive, bipolar and related disorders and anxiety and obsessive-compulsive disorders.  Tr. 82.  The doctor found that Plaintiff had no limitations in her ability to understand, remember, or apply information; mild limitation in her abilities to concentrate, persist, or maintain pace and adapt or manage oneself, and moderate limitation in her ability to interact with others.  Id.

On September 13, 2018, Dr. Perrone continued Plaintiff on Xanax and noted that she was continuing with weekly counseling.  Tr. at 963, 968.  On December 29, 2018, Plaintiff was evaluated at Lower Bucks Hospital after being involuntarily committed by her mother due to claims of "erratic angry behavior" and "threat of suicidal ideation," although Plaintiff denied feeling suicidal.  Id. at 1288.  She was diagnosed with other specified depressive disorder, probable PTSD, personality disorder with borderline traits, and assessed with a Global Assessment of Functioning ("GAF") score of 35 on

admission.[20]  Id. at 1292-94.  She was treated with Cymbalta and Abilify.[21]  Id. at 1324.

She was discharged on January 3, 2019, with prescriptions for Xanax, Abilify, and

Cymbalta, id. at 1325, at which time she had a GAF of 50.  Id. at 1324.[22]

In a Psychological Report dated June 28, 2019, Dr. Friedman indicated that she

had treated Plaintiff beginning on April 12, 2018, diagnosed Plaintiff with MDD and

panic disorder with agoraphobia, and found that Plaintiff had a GAF score of 48.  Tr. at

619-22.  She explained that Plaintiff presented with a "lack of concentration, cognitive

organization, changing from one subject to another with no apparent correlation."  Id. at

---

[20]A GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM-IV-TR"), at 34.  A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) [or] major impairment in several areas such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  Id.  The DSM 5, which replaced the DSM-IV-TR, eliminated reference to the GAF score.  However, the Commissioner continues to receive and consider GAF scores in mental evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016).

[21]Abilify is an antipsychotic used to treat the symptoms of psychotic conditions including schizophrenia and used with antidepressant medication to treat MDD.  See https://www.drugs.com/abilify.html (last visited Dec. 19, 2023).

[22]During this admission, Fredrica Mann Friedman, Ph.D., was identified as Plaintiff's psychologist, who had been treating Plaintiff for depression and anxiety for the prior year.  Tr. at 1292, 1322.
    A GAF score of 41-50 indicates [s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR at 34.

621.  Dr. Friedman explained that Plaintiff often missed appointments due to her

agoraphobic anxiety with panic attacks and a combination of excess fatigue and

prescription pain medication which led to her sleeping though appointment times.  Id.  As

a result, the doctor established a system of substitute sessions, utilizing the telephone and

having sessions with Plaintiff's husband to confirm Plaintiff's mood and problems.  Id.

Dr. Friedman opined that Plaintiff's mental health conditions and "severe debilitation

from [CRPS] render[] [Plaintiff] unemployable and prevent[] her from re-entering the

workplace."  Id. at 622.

On November 10, 2020, Plaintiff reported to Dr. Perrone that she felt "well" on

her current medication regimen and the medication allowed her to complete activities of

daily living.  Tr. at 1240.  Dr. Perrone renewed Plaintiff's prescription for Xanax.  Id. at

1242.

On January 4, 2022, Dr. Friedman provided an updated Psychological Report,

indicating that Plaintiff attended regular telehealth sessions following the COVID

pandemic, and noticing a "significant decrease" in Plaintiff's GAF score to 35.  Tr. at

1605.  The doctor indicated that Plaintiff's mental health medication regimen had

changed from Cymbalta and Xanax to Cymbalta and clonazepam.[23]  Id.  The doctor

provided a Medical Source Statement indicating that Plaintiff was unable to meet

competitive standards or had no useful ability to function in all of the abilities and

---

[23]Clonazepam (brand name Klonopin) is a benzodiazepine used to treat seizure
disorder and also to treat panic disorder including agoraphobia.  See
https://www.drugs.com/clonazepam.html (last visited Dec. 19, 2023).

aptitudes listed, except that she was able to adhere to basic standards of neatness and cleanliness.  Id. at 1609-10.

> Due to extreme chronic pain and pain medication, memory, concentration, inability to use her left hand and right foot leading to physical accidents, emotional outbursts, and social withdrawal, phobic fears of situations causing or leading to more pain or life-threatening results all cause relationship problems and inability to function in a work situation.

Id. at 1609.

### D.   **Plaintiff's Claims**

Plaintiff complains that the ALJ improperly considered medical opinion evidence regarding limitations imposed by her mental health impairments and the impairment of her left hand.  As I will explain, I find no error in the ALJ's consideration of the mental health treatment evidence, but conclude that the ALJ erred in her consideration of the limitations imposed by Plaintiff's left-hand impairment and the opinion of the consultative examiner in this regard.  Therefore, I will remand the case for further consideration of the limitations imposed by Plaintiff's left-hand impairment.

### 1.   Evaluation of Mental Health Treatment Evidence

Plaintiff claims that the ALJ erred by failing to properly consider the opinions of treating psychologist Dr. Friedman and consultative examiner Dr. Primavera.  Doc. 6 at 3-12; Doc. 8 at 1-4.  Defendant responds that substantial evidence supports the ALJ's evaluation of the opinion evidence.  Doc. 7 at 7-10.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. § 404.1520c(a).[24]  The regulations list the factors to be utilized in considering

medical opinions:  supportability, consistency, treatment relationship including the length

and purpose of the treatment and frequency of examinations, specialization, and other

factors including familiarity with other evidence in the record or an understanding of the

disability program.  Id. § 404.1520c(c).  The most important of these factors are

supportability and consistency, and the regulations require the ALJ to explain these

factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The

regulations explain that "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical

opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id.

§ 404.1520c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with

the evidence from other medical sources and nonmedical sources . . . , the more

persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must

consider all the evidence and give some reason for discounting the evidence she rejects."

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714

F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may

---

[24]In contrast, the regulations governing applications filed before March 17, 2017,
spoke in terms of the weight to be given each opinion, including controlling weight for
the opinions of certain treating sources.  20 C.F.R. § 404.1527.

choose which evidence to credit and which evidence not to credit, so long as she does not

"reject evidence for no reason or for the wrong reason."  Rutherford v. Barnhart, 399

F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v.

Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

The ALJ considered both Dr. Friedman's June 28, 2019 and January 4, 2022

statements and found that each was not persuasive.

> The undersigned considers the June 28, 2019, statement of
> Dr.  . . . Friedman, who opined that [Plaintiff] was
> unemployable due to [MDD], panic disorder with
> agoraphobia and [CRPS] ([tr. at 619-22]).  This opinion is not
> persuasive.  At the outset, it combines both [Plaintiff's]
> physical and mental impairments.  This opinion is not
> supported by [Plaintiff's] treatment record, which in
> summaries from Dr. Friedman herself stated indicated
> resulted in only one brief hospitalization during her treatment
> of [Plaintiff], with her mental status examinations only noting
> lack of concentration and cognitive organization and reported
> missing of appointments due to fear of leaving the house.
> These limitations are also not consistent with [Plaintiff's]
> activities of daily living, her attendance at her doctor's
> appointments and her ability to perform childcare to three
> children, including one with special needs, while her husband
> works day shift.  They are also not consistent with the overall
> treatment in the record, indicating normal affect, memory and
> orientation and no observation of panic attacks.
>
> The undersigned considered the January 2022 opinion of Dr.
> Friedman who opined [Plaintiff] had no useful ability to
> function in most areas and that she would be absent more than
> 4 days per month.  She cited [Plaintiff's] extreme chronic
> pain and medication, stating her memory, concentration and
> inability to use her left hand and right foot lead to physical
> accidents, emotional outbursts, social withdrawal and phobic
> fears of situations causing or leading to more pain of life-
> threatening results all causing relationship problems and an
> inability to function at work.  She stated [Plaintiff] had
> episodic panic attacks with agoraphobia and fear of pain and

dying from an accident ([tr. at 1607-12]).  This opinion is not
persuasive.  These extreme limitations are an overstatement
of [Plaintiff's] limitations.  In addition, they combine
[Plaintiff's] physical impairments, citing [Plaintiff's] chronic
pain as leading to a decline in functioning without providing
evidence that she observed [Plaintiff] in pain or distress.  Her
extreme limitations, and a GAF of 35 suggest [Plaintiff]
should be institutionalized if she indeed had no ability to
function.  They are not supported by [Plaintiff's] treatment
record, which in summaries from Dr. Friedman herself stated
indicated resulted in only one brief hospitalization during her
treatment of [Plaintiff], with her mental status examinations
only noting lack of concentration and cognitive organization
and reported missing of appointments due to fear of leaving
the house.  These limitations are also not consistent with
[Plaintiff's] activities of daily living, her attendance of her
own doctor's appointments and her ability to perform
childcare to three children, including one with special needs,
while her husband works day shift.  They are also not
consistent with the overall treatment in the record, indicating
normal affect, memory and orientation and no observation of
panic attacks.

Tr. at 1044-45.

Plaintiff first alleges that the ALJ failed to abide by the Appeals Council's remand

order, requiring the ALJ to consider whether Dr. Friedman's opinion was consistent with

the record as a whole.  Doc. 6 at 4 (citing tr. at 1108-09).  Contrary to Plaintiff's

argument, the ALJ specifically concluded that Dr. Friedman's opinions were not

consistent with the overall treatment in the record, with her activities of daily living

including caring for her three children, and with the mental health treatment she received.

Id. at 1045.  Thus, the ALJ did what the Appeals Council instructed.

Moreover, the ALJ's conclusion that Dr. Friedman's assessment was inconsistent

with the record as a whole is supported by the evidence in the record.  Dr. Perrone, who

treated Plaintiff's depression and anxiety, did not indicate any deficiencies in Plaintiff's judgment, insight, orientation, or memory, even when she had increased depressive symptoms.  Tr. at 360 (11/21/2016), 642-43 (4/11/17), 634 (7/25/17), 966 (9/13/18), 953 (4/30/19), 1236 (1/9/20).  At a telehealth visit on November 10, 2020, Plaintiff reported that she "feels well" and "meds allow completion of ADLs."  Id. at 1240.  Similarly, the doctors at IP&S consistently noted that Plaintiff had depressed mood but an appropriate affect and was alert and oriented, including the period of time when Plaintiff was seeing Dr. Friedman.  See, e.g., id. at 1347 (11/18/21), 1410 (4/8/21), 1437 (11/16/20), 582-83 (2/15/19), 557 (7/12/18), 529 (10/13/17), 512 (3/10/17), 503-04 (12/8/16).  In addition, the staff at Vincera noted that Plaintiff was alert and cooperative without anxiety or depression.  Id. at 409 (7/14/17).  The exception to these benign findings was when Plaintiff was involuntarily committed on December 29, 2018, when she exhibited erratic angry behavior and had suicidal ideation.  Id. at 1288.  Dr. Friedman explained that this "psychotic episode, marked by features of irrational thinking," occurred as Plaintiff was planning a family vacation and was "unable to cope with the multiple details of the planning."  Id. at 621-22.

Dr. Friedman's opinions are also inconsistent with many of consultative examiner Dr. Primavera's conclusions.  For example, Dr. Primavera found a mild impairment to Plaintiff's recent and working memory, and opined that Plaintiff had no limitations in understanding, remembering, and carrying out simple instructions and mild limitation with respect to complex instructions.  Tr. at 479, 481.  In contrast, Dr. Friedman found that Plaintiff was unable to meet competitive standards with respect to her ability to

understand and remember very short and simple instructions and had no useful ability to carry out very short and simple instructions.  Id. at 1609.

Plaintiff complains that the ALJ "failed to address the consistency of Dr. Friedman's opinion with other evidence in the record."  Doc. 6 at 10.  Contrary to this, the ALJ did address Dr. Friedman's opinions and found that they were "not consistent with the overall treatment in the record, indicating normal affect, memory, and orientation and no observation of panic attacks."  Tr. at 1045.  Unhappy with the ALJ's conclusion, Plaintiff responds in her reply brief that "the ALJ should have focused more on Dr. [Friedman's] specific explanation concerning her patient's significant ongoing limiting symptoms that would prevent her from engaging in competitive work."  Doc. 8 at 2.  But the ALJ was not required by either the regulations or the Appeals Council to find Dr. Friedman's opinions persuasive.  The Appeals Council remanded the case with direction that the ALJ specifically consider supportability and consistency in analyzing the medical source opinions.  Tr. at 1109.  I find no error in the ALJ's consideration of Plaintiff's mental health status as noted by her other treatment providers in analyzing Dr. Friedman's opinions.

Plaintiff also claims that the ALJ mischaracterized Plaintiff's activities in determining that the limitations noted by Dr. Friedman were inconsistent with Plaintiff's daily activities.  Doc. 6 at 9.  Specifically, Plaintiff complains that the ALJ failed to cite to any evidence in the record establishing that Plaintiff "singlehandedly cares for three children."  Id.  As quoted in the above excerpt, the ALJ stated that the extreme limitations noted in Dr. Friedman's assessment were "not consistent with [Plaintiff's] activities of

daily living, her attendance of her own doctor's appointments and her ability to perform childcare to three children, including one with special needs, while her husband works day shift." Tr. at 1045.  The ALJ has not mischaracterized the evidence.  As discussed in the medical evidence, Plaintiff routinely treated with IP&S for her pain.  In addition to attending her own doctors' appointments, Plaintiff also advocated for treatment during those visits.  See, e.g., id. at 554 (7/12/18 – wants to discuss nerve block in right foot), 572 (12/27/18 - wants to discuss an injection for left hand), 597 (5/23/19 – wants to discuss injection for right leg).

With respect to childcare, Plaintiff testified at the first hearing that her husband worked 10 a.m. to 5 p.m., and she had three children, then aged 14, 15, and 6.  Tr. at 38.  Although they were all school-aged, Plaintiff said that they were not participating in any summer programs.  Id.  Plaintiff reported to Dr. Dzurinko that her husband does the household chores while "[s]he does child care seven days a week."  Id. at 486.  At the first hearing, Plaintiff explained that her older daughters took care of her younger son during the day.  Id. at 49.  She also explained that her son is disabled with rheumatoid arthritis and comes and watches movies with her.  Id. at 62.  In her Function Report, Plaintiff stated that she can microwave food or snacks and does homework with her children 2-3 times a week.  Id. at 233-34, 236.  She also shops for food, household items, and for her children's needs in stores, by phone, and online.  Id. at 235.  I find no error in the ALJ's reliance on Plaintiff's activities in determining the consistency of Dr. Friedman's assessment with the record.

Plaintiff also argues that the ALJ substituted her lay opinion for that of the medical experts when she stated that Dr. Friedman's opinions "suggest the claimant should be institutionalized if she indeed had no ability to function."  Doc. 6 at 9 (quoting tr. at 1045).  I agree with Plaintiff that the ALJ's statement was inappropriate and lacking foundation.  However, the isolated comment did not "cross the line into the ALJ substituting [her] opinion for those of her doctors" requiring remand.  Walls v. Barnhart, Civ. No. 01-2361, 2002 WL 485641, at *11 n.11 (E.D. Pa. Mar. 28, 2002); see also Maroney v. Colvin, Civ. No. 15-39, 2016 WL 278990, at *6 (W.D. Pa. Jan. 22, 2016) (finding isolated inappropriate comments insufficient to evince bias or require remand).  As discussed, the ALJ's determination that Dr. Friedman's assessment was inconsistent with the record as a whole is supported by substantial evidence.

Plaintiff also complains that the ALJ improperly relied on the fact that Dr. Friedman had not observed Plaintiff having a panic attack in considering Dr. Friedman's opinion.  Doc. 6 at 11 (citing tr. at 1045 (Dr. Friedman's limitations "are also not consistent with . . . no observation of panic attacks")).  Plaintiff argues that the ALJ's finding that Plaintiff's panic disorder with agoraphobia was severe "is an implicit acceptance of the fact that Plaintiff suffers from recurrent panic attacks."  Id.  This conclusion, however, does not vitiate the ALJ's duty to determine the functional limitations imposed by the impairment.  See Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990) (recognizing that diagnosis of an impairment is not sufficient to establish disability, but rather functional limitations arising from impairment must be considered).

As previously discussed, the ALJ determined that Dr. Friedman's assessment was inconsistent with the record as a whole.

Plaintiff also contends that the ALJ failed to properly consider the opinion of consultative examiner Dr. Primavera, who found that Plaintiff had a marked limitation in her abilities to interact with the public and respond appropriately to usual work situations and changes in a routine work setting.  Doc. 6 at 10 (citing tr. at 482).  Defendant responds that the ALJ's consideration of Dr. Primavera's assessment was supported by substantial evidence.  Doc. 7 at 8-9.

Contrary to Plaintiff's argument, the ALJ adequately explained her consideration of Dr. Primavera's opinion.

> This opinion is somewhat persuasive, as the mostly mild to moderate limitations in mental functioning are supported by Dr. Primavera's mental status examination findings.  The marked limitations, however, are not supported with his findings [that Plaintiff] was cooperative with appropriate eye contact and had good insight and judgment.  The longitudinal evidence of the record is also not consistent with finding that [Plaintiff] has marked limitations in any area of mental functioning as [Plaintiff's] mental health treatment during the period at issue has generally been routine, conservative, and outpatient with the need for one brief hospitalization and treatment notes indicate normal psychological findings at her primary care physician and pain management appointments.

Tr. at 1044.  The ALJ's conclusions are supported by substantial evidence.  Dr. Primavera found that Plaintiff had no limitation or only mild limitation in the abilities to understand, remember, and carry out instructions, consistent with the notations of Plaintiff's primary care physician and pain management specialists.  Id. at 481.  With respect to interaction, the doctor noted marked limitation in Plaintiff's abilities to interact

with the public and respond to usual work situations and changes in a routine work setting, and moderate limitation in the abilities to interact with supervisors and coworkers. Id. at 482. However, Dr. Primavera noted that Plaintiff was cooperative and her social skills and overall presentation were adequate, with normal eye contact and adequate expressive language, and good insight and judgment. Id. at 478-79. Moreover, as previously discussed, Plaintiff's other treatment providers consistently noted normal psychological findings, see supra at 22-23, and indicated Plaintiff was able to advocate for treatment on her own behalf. See supra at 25.

Plaintiff also complains that the ALJ failed to acknowledge the statements of Plaintiff and her husband that are consistent with Dr. Primavera's findings regarding stress and changes in routine. Doc. 6 at 11. Both Plaintiff and her husband provided Function Reports in which they indicated that Plaintiff does not handle stress well, causing her to stay in bed and get frustrated, anxious, and angry. Tr. at 237-38, 286. With respect to Plaintiff's statements and testimony, the ALJ found the record did not support the severity of her alleged symptoms. Tr. at 1037. Although the ALJ did not specifically refer to Plaintiff's husband's statement, I do not find that the omission warrants remand. There is "no authority for the proposition that an ALJ must cite all evidence a claimant presents, including evidence that is irrelevant to her case." Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203-04 (3d Cir. 2008). Here, Plaintiff's husband's statement was cumulative of the statement and testimony offered by Plaintiff. The ALJ found Plaintiff's statements were inconsistent with the record as a whole, tr. at 1037, and this finding is supported by substantial evidence as previously discussed. See Putman v.

Colvin, Civ. No. 15-412, 2016 WL 1301048, at *7 (M.D. Pa. Apr. 4, 2016) (remand unnecessary where the ALJ fails to address testimony cumulative of that already addressed); Brandt v. Colvin, Civ. No. 13-2165, 2014 WL 4793956, at *6 (M.D. Pa. Sept. 24, 2014 (same).  Thus, I find no error with respect to the ALJ's consideration of the mental health opinion evidence and that the ALJ's related findings are supported by substantial evidence.

### 2. Left Upper Extremity Limitations

Plaintiff next claims that the ALJ erred in determining that she could frequently handle, finger, and feel with her dominant left hand.  Doc. 6 at 12.  Specifically, Plaintiff complains that the ALJ improperly rejected the opinion of consultative examiner Dr. Dzurinko, who found that Plaintiff could only occasionally (up to 1/3 of the time) handle, finger, and feel with her left hand.  Doc. 6 at 13 (citing tr. at 492).  As noted, supra at 8, the VE testified that no work would exist if Plaintiff could only occasionally finger, feel, and handle.  Tr. at 1077-78.[25]  Defendant responds that substantial evidence supports the ALJ's RFC assessment, including the limitation in handling, fingering, and feeling.  Doc. 7 at 10-11.

As previously mentioned, the analysis of opinion evidence focuses on supportability and consistency.  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not

---

[25]Originally, when asked about occasional handling, fingering, and feeling, the VE identified jobs he believed would be appropriate, but when reminded of the limitation of no contact with the public, the VE said no work would be available.  Tr. at 1076-77.

"reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554

(quoting Mason, 994 F.2d at 1066); see also Plummer, 186 F.3d at 429 (same).

Here, the ALJ found that Dr. Dzurinko's assessment was not persuasive.

> This opinion is not persuasive, as it is not supported by [Dr.
> Dzurinko's] examination of [Plaintiff].  The upper extremity
> limitations are an overstatement and her full strength,
> including bilateral grip, her intact sensation, ability to button,
> zip and tie, do not support a limitation to only occasional
> handling, fingering and feeling with the left hand.  It is also
> not supported by [Plaintiff's] negative straight leg raise and
> normal lumbar spine x-ray.  The evidence in the record is also
> not consistent with these limitations, with consistent full
> upper extremity strength, some swelling and tenderness of the
> right lower foot and only slight allodynia in the left hand but
> full range of motion ([tr. at 1334-1604]).

Tr. at 1044.

The ALJ correctly noted that Dr. Dzurinko's left-hand assessment is inconsistent

with his examination, which evidenced that Plaintiff's hand and finger dexterity were

intact, her grip strength was 5/5, and she was able to button, zip, and tie on the model in

the office.  Tr. at 486, 488.  Nevertheless, the ALJ's analysis is flawed because she

misstated or mischaracterized other evidence in the record.  In finding Dr. Dzurinko's

opinion not persuasive, the ALJ relied on, among other things, the treatment notes from

IP&S contained in Exhibit 24F, which the ALJ characterized as showing "only slight

allodynia in the left hand but full range of motion."  Tr. at 1044 (citing Exhibit 24F – tr.

at 1334-1604) (emphasis added).  Review of the cited treatment notes reveals that the

examination notes from IP&S consistently state that Plaintiff had decreased of range of

motion of the left hand, including approximately 21 times from June 27, 2019 to

November 18, 2021.  See e.g., id. at 1347 (11/18/21), 1421 (2/12/21), 1437 (11/16/20),

1523 (4/7/20), 1560 (12/19/19), 1595 (6/27/19).  In addition, earlier treatment notes from

IP&S also note decreased range of motion of the left hand.  See id. at 557 (7/12/18), 562

(9/6/18), 570 (11/2/18), 575 (12/27/18), 582 (2/15/19), 589 (4/4/19), 595 (4/29/19), 601

(5/23/19).  This is also consistent with Plaintiff's initial evaluation at Excel Physical

Therapy on June 7, 2018, wherein physical therapist Michael St. George noted that

Plaintiff presented with "pain, deficient mobility, motor control, strength, [and]

sensitivity to touch" of the left wrist.  Id. at 616.

As previously noted, the ALJ may choose which evidence to credit and which

evidence not to credit, so long as she does not "reject evidence for no reason or for the

wrong reason."  Rutherford, 399 F.3d at 554 (quoting Mason, 994 F.2d at 1066); see also

Plummer, 186 F.3d at 429 (same).  Here, the ALJ found Dr. Dzurinko's assessment not

persuasive based partially on a misstatement/mischaracterization of the evidence.  In light

of the VE's testimony that a limitation to occasional fingering, feeling, and handling

(along with the other limitations the ALJ found) would result in a finding of disability,

the ALJ's mischaracterization of the treatment notes in this regard is critical.  Therefore, I

will remand the case for further consideration of the limitations imposed by Plaintiff's

left-hand impairment.[26]

---

[26]Although Plaintiff requests the court to remand the case with a direction for
benefits because the evidence establishes that she is entitled to DIB, Doc. 6 at 16, 17, a
remand for benefits is appropriate only "when the administrative record of the case has
been fully developed and when substantial evidence on the record as a whole indicates
that the claimant is disabled and entitled to benefits."  Diaz v. Berryhill, 388 F. Supp.3d
382, 391 (M.D. Pa. 2019) (quoting Podedworny v. Harris, 745 F.2d 201, 221-22 (3d Cir.

**IV.    <u>CONCLUSION</u>**

The ALJ properly evaluated the evidence regarding Plaintiff's mental health impairments and her decision with respect to the limitations imposed by Plaintiff's mental health impairments is supported by substantial evidence.  However, the ALJ mischaracterized the evidence with respect to the limitations imposed by Plaintiff's left-hand impairment in evaluating Dr. Dzurinko's assessment.  Therefore, the ALJ's decision is not supported by substantial evidence.

An appropriate Order follows.

---

1984)).  Here, it is not clear if Plaintiff's decreased range of motion of the left hand would limit her to occasional rather than frequent fingering, feeling, and handling, in light of the evidence that Plaintiff had full grip strength and evidenced no limitations in her abilities to button, zip, and tie at the consultative examination.